**DISTRICT 17, UNITED MINE WORKERS OF AMERICA, and John Craft, Plaintiffs,**

v.

**BRUNTY TRUCKING COMPANY, Defendant.**

**No. CIV.A.2:02–0998.**

United States District Court, S.D. West Virginia, Charleston Division.

July 1, 2003.

---

Bradley J. Pyles, Crandall, Pyles, Haviland & Turner, LLP, Logan, Charles F. Donnelly, District 17, United Mine Workers of America, Charleston, for Plaintiffs John Craft & District 17, United Mine Workers of America.

Paul R. Cassell, Burton & Kilgore, Princeton, for Defendant Brunty Trucking Co.

## MEMORANDUM OPINION & ORDER

GOODWIN, District Judge.

Pending is a motion for summary judgment filed by the plaintiffs [Docket 26]. For the following reasons, the court **GRANTS** the motion, **ORDERS** Brunty to reimburse Mr. Craft $3,359.27 for his past medical expenses, and **ORDERS** Brunty to provide Mr. Craft with lifetime health benefits as required by the collective bargaining agreement.

## I. Background

Beginning in November of 1989, plaintiff John F. Craft was employed by the defendant, Brunty Trucking Company, as a coal truck driver. Mr. Craft was employed under a collective bargaining agreement between Brunty and the United Mine Workers of America (UMWA). Under the collective bargaining agreement, Brunty agreed to be bound by the National Bituminous Coal Wage Agreement of 1993 (the 1993 NBCWA), a collective bargaining agreement between the UMWA and the Bituminous Coal Operators' Association (BCOA). On April 30, 1996, Mr. Craft was injured and could no longer work. As a result of his injury, Mr. Craft was awarded Social Security disability benefits and a disability pension from the UMWA 1974 Pension Plan. In the letter informing him of his award of a disability pension, the UMWA also advised Mr. Craft that he might be eligible for health benefits from his last signatory employer, Brunty.

Brunty provided Mr. Craft with health benefits until June of 2001, when his benefits were terminated after Brunty had ceased business operations on March 31, 2001. After his benefits were terminated

by Brunty, Mr. Craft applied for health benefits from the UMWA 1993 Benefit Plan. The Plan conducted an investigation and determined that while Brunty was no longer conducting business, it had net assets of $34,039 as of October 31, 2001. Because of these funds, the Plan denied Mr. Craft's application for health benefits on the grounds that Brunty, while no longer conducting operations, nonetheless still had assets from which it could provide benefits. Under the terms of the 1993 NCBWA, the 1993 Plan's obligation to provide Mr. Craft with health benefits did not arise until his last signatory employer, here Brunty, no longer had assets from which to provide benefits. Brunty took the position that it was no longer in business, that its obligation to provide benefits had ceased, and that the Plan was the sole party obliged to provide benefits to Mr. Craft.

With neither party providing his health benefits, Mr. Craft and District 17 of the UMWA filed suit against both Brunty and the 1993 Plan on August 5, 2002. The plaintiffs sued under § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, and § 502(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a), seeking a declaration that Mr. Craft was entitled to health benefits and compensatory damages in the amount of Mr. Craft's past unpaid medical bills. On September 24, 2002, the plaintiffs filed a notice of voluntarily dismissal of their claims against the 1993 Plan. In the notice, the plaintiffs stated that based on information from the 1993 Plan, Brunty still had assets with which to provide benefits, so Mr. Craft's claims against the 1993 Plan were premature. The plaintiffs now move for summary judgment, asking for an award of compensatory damages against Brunty in the amount of Mr. Craft's past unpaid medical bills as well as an injunction requiring Brunty to provide Mr. Craft with health insurance. The sole issue in dispute on summary judgment is whether Brunty has a continuing obligation under the collective bargaining agreement to provide Mr. Craft with health benefits.

## II. Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. Discussion

The plaintiffs bring suit under ERISA § 502, which provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan ...." 32 U.S.C. § 1132(a) (West 2003). In this case, Mr. Craft seeks to recover benefits he claims that Brunty was obliged to provide him under the 1993 NBCWA as well as an injunction setting forth his rights to future health benefits from Brunty under the 1993 NBCWA.

The parties agree that under the terms of the 1993 NBCWA, Mr. Craft is entitled to lifetime health benefits. They also agree that Brunty was the last signatory employer of Mr. Craft, and that at least initially Brunty was required to provide him with health benefits. The parties dispute whether Brunty is still obliged to pay those benefits, or whether its obligation has been terminated due to the fact that it is no longer in business and allegedly lacks any means by which to pay the benefits. The plaintiffs take the position that Brunty's obligation to pay Mr. Craft's benefits never ends, regardless of whether it is no longer in business or able to provide benefits. They concede that once Brunty is out of business and unable to provide benefits, the 1993 Plan becomes obliged to provide Mr. Craft with benefits. They argue, however, that the 1993 Plan's obligation is in addition to, and does not terminate, Brunty's obligation. The plaintiffs argue that the 1993 Plan's obligation is irrelevant here, because whether the Plan's obligations have been triggered or not, Brunty nonetheless remains obliged to provide benefits. Accordingly, the plaintiffs seek a

judgment to the effect that Brunty has an ongoing obligation to provide Mr. Craft with health benefits. If the plaintiffs then discover that Brunty lacks any assets with which to satisfy this judgment, it appears that the 1993 Plan will provide benefits.

In contrast, Brunty argues that once the 1993 Plan's obligations are triggered due to the fact that Brunty is no longer in business and is unable to provide benefits, Brunty's obligation is terminated. The plaintiffs do not dispute Brunty's contention that it is no longer in business, but they are not willing to concede that Brunty is unable to provide benefits. If the court adopts Brunty's view of the law—that Brunty's obligation ceases when the 1993 Plan's obligation is triggered—then summary judgment is unavailable, because there is a dispute of fact as to whether Brunty currently has any assets from which to pay benefits. If the court adopts the plaintiffs' view of the law, however, Brunty's obligation is unaffected by its ability *vel non* to provide benefits, and summary judgment is appropriate for the plaintiffs.

■ Brunty first argues that the plaintiffs' arguments about the 1993 NBCWA's provisions for retirees miss the mark, because Mr. Craft is a disability pensioner, not a retiree. Brunty argues that health benefits for disability pensioners are provided separately from health benefits for retirees, and that provisions governing the latter do not govern the former. Rather, Brunty locates the provision of health benefits for disabled pensioners in Article XX(10)(c) of the agreement, which provides that "[p]ensioners, both regular and disabled, ... who are described in Section (c)(3)(ii) will have benefits provided under the 1993 Benefit Plan and Trust." (Art. XX(1)(c)).[1] The court disagrees with

---

1. The relevant portions of the 1993 NBCWA are attached as Exhibit 2 to the plaintiffs' memorandum in support of their motion for summary judgment. In this opinion, the court will cite directly to the NBCWA.

Brunty's reading of the agreement. As used throughout the agreement, the term "disability pensioner" is clearly a subset of the general category of "retirees." Accordingly, those provisions related to health care benefits for retirees govern the determination of Mr. Craft's health benefits. Section (5) of Article XX, which is titled "Pensions for Disabled Miners," provides that:

A miner who becomes permanently and totally disabled as a result of a mine accident . . . will become eligible for pension benefits in accordance with the following schedule:

(a) If a miner has less than ten years of signatory service *at the time of retirement,* the miner will receive a $200 per month pension. *Such pensioner* will be entitled to retain a Health Services card for life. . . .

(b) If a miner has ten years or more of signatory service *at the time of retirement,* the miner will receive . . . [a pension according to a certain formula]. *Such pensioner* will be entitled to retain a Health Services card for life. . . .

(Art. XX(5) (emphasis added)). As used in this provision, a "disability pensioner" is clearly a member of the general group of "pensioners." [2] In addition, a "disability pensioner" is also a member of the general group of "retirees." This court has previously determined that an employee "retires" for purposes of receiving retiree benefits under the agreement on the date that the employee ceases working, regardless of the reason that the employee ceased work. *See UMWA v. Bethenergy Mines, Inc.,* No. 2:99–0738, 2001 WL 737558 (S.D.W.Va. Mar. 19, 2001). Accordingly, on the day Mr. Craft ceased working due to his disability, he was not only a "disability pensioner," he was also a "retiree." Those provisions of the agree-

ment governing benefits for retirees are thus controlling in determining Mr. Craft's benefits.

■ Brunty next argues that even if Mr. Craft is a retiree, the terms of the agreement make clear that once Brunty is no longer in business and has no assets, its obligation to provide health benefits ends and the 1993 Plan's obligation begins. The court begins with the language of the collective bargaining agreement. Subsection (c)(3) of Article XX of the 1993 NBCWA provides the conditions under which the employer and the 1993 Plan will provide health benefits to eligible employees. Subsection (c)(3)(i) provides that "[e]ach signatory Employer shall establish and maintain an employee benefit plan to provide . . . health and other non-pension benefits for its Employees covered by this Agreement . . . ." (Art. XX(c)(3)(i)). Subsection (c)(3)(ii) provides that "[t]he 1993 Benefit Plan and Trusts provides health and other non-pension benefits during the term of this Agreement, to any retired miner . . . who meets the conditions of one of the following." (Art. XX(c)(3)(ii)). The condition relevant here is found in subsection (c)(3)(ii)(c), which is when "[t]he miner is retired . . . and would otherwise cease to receive the health and other non-pension benefits provided herein because such last signatory Employer . . . is no longer in business." (Art. XX(c)(3)(ii)(c)). The Employer is considered to be "no longer in business" if two conditions are met:

(I) The Employer has ceased all mining operations and has ceased employing persons under this Wage Agreement, with no reasonable expectation that such operation will start up again; and

(II) The Employer is financially unable . . . to provide health and other non-

---

**2.** This is also clear from the provision quoted by Brunty, Art. XX(10)(c) of the agreement, which refers to "[p]ensioners, both regular and disabled."

pension benefits to its retired miners and surviving spouses. (Art. XX(c)(3)(ii)(c)). Brunty argues that subsection (c)(3)(i) and (c)(3)(ii) provide alternate routes for health benefits, and that when the 1993 Plan's obligations under (c)(3)(ii) are triggered, the employer's obligations under (c)(3)(i) are extinguished. The relevant question, argues Brunty, is simply whether it meets the two conditions set forth in (c)(3)(ii) to trigger an obligation on the part of the 1993 Plan and to discharge its obligation. The plaintiffs, in contrast, argue that nothing in either subsection indicates that the employer's obligations under (c)(3)(i) terminate upon the triggering of the 1993 Plan's obligations under (c)(3)(ii).

The court agrees with the plaintiffs that there is no language in either part of subsection (c)(3) that expressly indicates that the triggering of the 1993 Plan's obligation terminates the employer's obligation. Subsection (c)(3)(i), which explains the employer's obligation, states only that "[e]ach signatory Employer shall establish and maintain an Employee benefit plan to provide . . . health and other non-pension benefits." (Art. XX(c)(3)(i)). This language imposes an obligation on the Employer to establish a health benefit plan, but does not say anything about when or if that obligation might cease. Subsection (c)(3)(ii) establishes the conditions under which the 1993 Plan shall be obliged to provide health benefits, but says nothing about terminating or releasing the employer's obligation. Later in Article XX, under the subheading "General Description of the Health and Retirement Benefits," the Agreement states that "[t]he parties expressly agree that the language references to 'for life' and 'until death' that are retained in this General Description are intended to mean that each Employer will provide, for life, . . . the benefits of its own eligible retirees . . . ." (Art. XX, at 163). This language suggests that the employ-

er's obligation, set forth in Art. XX(c)(3)(i), continues for the life of the retiree, and thus supports the plaintiffs' position that the employer's obligation does not end when the 1993 Plan's obligation begins.

The history of the collective bargaining agreements between the UMWA and the BCOA further supports this reading of the agreement. This history has been repeatedly set forth in judicial opinions, including this court's opinion in *Bethenergy Mines*, which relied in part on the history recited in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). In light of these more complete accounts, the court's recitation here will be limited to those parts of the history that are most relevant to the current dispute. The collective bargaining agreements between the UMWA and the BCOA have included provisions regarding health and retirement benefits since 1946. *Id.* at 504–05, 118 S.Ct. 2131. Over the years, health benefits were provided by a series of trust funds (the Benefits Plans) supported by contributions from signatory employers. In the 1974 NBCWA, the parties for the first time guaranteed *lifetime* health coverage for retired miners, by providing that retired miners would be entitled to retain their health cards for life. *Id.* at 509, 118 S.Ct. 2131. Court decisions starting in 1985 determined that the 1974 NBCWA required signatory employers to provide these benefits only during the life of the agreement, and that the Benefit Plans were required to provide benefits thereafter, for the life of the retiree. *See Dist. 29, UMWA v. Royal Coal Co.*, 768 F.2d 588 (4th Cir.1985); *Dist. 29, UMWA v. UMWA 1974 Ben. Plan & Trust*, 826 F.2d 280 (4th Cir.1987). In the wake of these decisions, employers who ceased to sign on to new collective bargaining agreements between the BCOA and the UMWA were no longer obliged to provide health benefits to their retirees. The Benefit

Plans, funded by the dwindling pool of signatory employers, were quickly overwhelmed by the costs of providing benefits to the hundreds of thousands of retirees whose last employers were no longer signatories to the new agreements. *Eastern Enterprises*, 524 U.S. at 510–11, 118 S.Ct. 2131. Congress responded by passing the Coal Industry Retiree Health Benefits Act of 1992 (the Coal Act), which required prior signatory employers to pay the health benefits of their currently retired workers, a class of about 200,000 retired coal miners. *Id.* at 514, 118 S.Ct. 2131. The Act did not, however, address future retirees.

With this history of past signatory employers being relieved of their obligation to provide benefits to their retirees and the corresponding overburdening of the previous Plans, the UMWA and the BCOA entered negotiations for a new collective bargaining agreement in the early 1990s. The course of these negotiations is described in an affidavit by Michael Buckner, the director of research for the UMWA, who participated in the negotiations that led to the 1984, 1988, 1993, 1998, and 2002 NBCWAs. Mr. Buckner states that one of the UMWA's two main concerns in negotiating the 1993 NBCWA was "that the promise of lifetime health care be kept for miners and their family members who were not protected by the Coal Act." (Buckner Aff. ¶ 7.) In the course of negotiations, Buckner states, the BCOA "proposed to include new language to make it clear that each employer agreed to provide health care benefits for the life of its own retirees and their dependents." (Buckner Aff. ¶ 13.) This would resolve the problem created by the 1974 NBCWA which, as interpreted by the courts, had limited an employer's responsibility to provide health benefits to the life of the contract. "By requiring that each employer guarantee the benefits for life of its own former employees and their eligible family members, BCOA hoped to sharply reduce the number of 'orphans' who would look to the remaining coal industry employers for benefits." (Buckner Aff. ¶ 13.) This led to the addition of the section providing that "the language references to 'for life' and 'until death' ... are intended to mean that each Employer will provide, for life, only the benefits of its own eligible retirees ...." (Buckner Aff. ¶ 13) (quoting Art. XX).[3]

In addition, the BCOA asked that the contract include language restricting eligibility for benefits from the 1993 Plan. The parties added the language providing that the Plan would not pay benefits until the employer had ceased all mining operations *and* was financially unable to provide benefits to its retirees, thus ensuring that employers who remained solvent, even if they left the coal industry, could not shift their obligation onto the plan. (Buckner Aff. ¶ 15.) Finally, Buckner also states that "[i]t was agreed that the employer's obligation was for the life of the retiree (and for the life of the retiree's spouse), and the *employer's* obligation does not disappear or shift to the 1993 Benefit Plan under any circumstances." (Buckner Aff. ¶ 20) (emphasis added).

In light of this history, it is all the more clear that the language in Article XX of the agreement, which provides that "each Employer will provide, for life, ... the benefits of its own eligible retirees," means just what it says—that each employer has a permanent obligation to provide lifetime health benefits to eligible retired miners. The most immediate problem under the 1974 NBCWA, as interpreted by the courts, was that employers' obligations to

---

3. The 1993 NBCWA contains the same provision as the 1974 NBCWA that retired miners shall be permitted to retain their health cards "for life." (Art. XX(5)(a) & (b)).

provide benefits ceased once they were no longer signatories to the contract. The new 1993 provision altered that situation by making it clear that the employers' obligation to provide health benefits continued for the life of the employer, not simply for the life of the collective bargaining agreement. But imposing a lifetime obligation on employers to provide health benefits would not ensure that retired miners would receive lifetime health benefits—if an employer became insolvent or went bankrupt, that employers' retired miners would lose their benefits. Accordingly, the parties created the 1993 Plan as a backup to further guarantee that all retired miners would receive the promised lifetime benefits. Once the employer was no longer in the coal business *and* was financially unable to provide benefits, then the 1993 Plan would provide the miner's benefits.

Contrary to Brunty's arguments, the creation of this backstop has no necessary bearing on the scope of the employers' already-defined obligations to provide benefits under the agreement. The 1993 Plan was not created because of a recognition that the employers' obligations to provide lifetime benefits would *cease* at some point—the agreement makes clear that the employers' obligation is for the life of its eligible retirees. Rather, the 1993 Plan was created in recognition of the fact that notwithstanding an ongoing legal obligation, those employers with no further business operations and no assets would be unable, as a practical matter, to provide the benefits. The court sees no reason why Article XX(c)(3)(ii), which creates the backstop of the 1993 Plan but makes no reference to the *employer's* obligation, should be read to somehow modify the scope of the otherwise plain statement that the employer has an obligation to provide, "for life," health benefits to its eligible retired employees. Brunty argues that "once an employer can demonstrate that it

is 'no longer in business' [as that term is defined above], it is relieved (out of necessity) from liability and the liability for health benefits shifts to the 1993 Benefit Plan." (Def.'s Mem. in Resp. to Summ. J., at 5.) Brunty errs in equating an inability to pay with a relief from an obligation to pay—as many a debtor can attest, *inability* to pay one's creditors does not, of necessity, relieve one of the *obligation* to pay them.

In light of the language of the agreement and the uncontested history of the collective bargaining agreements between the UMWA and the BCOA, the court concludes that Brunty has an ongoing, permanent legal obligation to provide health benefits for its eligible retired employees. The issues of whether Brunty is capable of fulfilling this obligation, and whether the 1993 Plan's obligation to provide benefits has been triggered, do not alter this conclusion.

Mr. Craft has submitted a declaration in which he claims medical bills in the amount of $3,359.27. Brunty does not contest this figure. Accordingly, the court ORDERS Brunty to reimburse Mr. Craft $3,359.27 for his past medical expenses and further ORDERS Brunty to provide Mr. Craft with lifetime health benefits as required by the agreement.

## IV. Conclusion

For the reasons stated herein, the court concludes that under the terms of the 1993 NBCWA, Brunty is obliged to provide lifetime health benefits to Mr. Craft, one of Brunty's eligible retired employees. The court further concludes that Brunty's obligation is unaffected by any obligation on the part of the 1993 Plan to provide benefits. Accordingly, the court **GRANTS** the plaintiffs' motion for summary judgment, **ORDERS** Brunty to reimburse Mr. Craft $3,359.27 for his past medical expenses,

and **ORDERS** Brunty to provide Mr. Craft with lifetime health benefits as required by the agreement.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and **DIRECTS** the Clerk to post this published opinion at *http://www.wvsd.uscourts.gov.*